```
 1                  UNITED STATES DISTRICT COURT

 2                     DISTRICT OF MINNESOTA

 3  -------------------------------------------------------------

 4  Michael Peluso,                  Case No. 17-cv-1299 (SRN/BRT)

 5          Plaintiff,

 6     vs.
                                     St. Paul, Minnesota
 7  New Jersey Devils, LLC,          Courtroom 7B
    et al.,                          October 27, 2017
 8                                   9:00 a.m.

 9          Defendants.

10  -------------------------------------------------------------

11          BEFORE THE HONORABLE SUSAN RICHARD NELSON

12             UNITED STATES DISTRICT COURT JUDGE

13    HEARING ON MOTION TO DISMISS/GENERAL FILED BY CHUBB GROUP
    HOLDINGS, INC., FEDERAL INSURANCE COMPANY [DOC. 17] AND MOTION
14  TO DISMISS/GENERAL FILED BY THE NEW JERSEY DEVILS, LLC AND ST.
              LOUIS BLUES HOCKEY CLUB, L.P. [DOC. 25]

15

16

17

18

19

20

21

22  Official Court Reporter:  Heather Schuetz, RMR, CRR, CRC, RSA
                              U.S. Courthouse, Ste. 146
23                            316 North Robert Street
                              St. Paul, Minnesota 55101
24
                    Proceedings recorded by mechanical stenography;
25  transcript produced by computer.
```

```
 1                    A P P E A R A N C E S

 2   For the Plaintiff:

 3                        Shawn D. Stuckey, Esq.
                          Hieu T. Pham, Esq.
 4                        ALL SPORTS LAW, LLP
                          600 W. Santa Ana Blvd., Ste. 790
 5                        Santa Ana, CA 92701

 6        Also Present:  Michael Peluso

 7   For Defendant New Jersey Devils, LLC and St. Louis Blues
     Hockey Club, L.P.:
 8
                          Christopher J. Schmidt, Esq.
 9                        Jonathan B. Potts, Esq.
                          BRYAN CAVE LLP
10                        211 N. Broadway, Ste. 3600
                          St. Louis, MO 63102
11
                          Scott M. Rusert, Esq.
12                        NILAN JOHNSON LEWIS PA
                          120 S. 6th St., Ste. 400
13                        Minneapolis, MN 55402

14   For Defendant Chubb Group Holdings, Inc. and Federal Insurance
     Company:
15
                          Shamus P. O'Meara, Esq.
16                        Mark R. Azman, Esq.
                          O'MEARA LEER WAGNER & KOHL, PA
17                        7401 Metro Blvd., Ste. 600
                          Minneapolis, MN 55439-3034
18

19

20

21

22

23

24

25
```

```
 1                P R O C E E D I N G S

 2                    IN OPEN COURT

 3                (Commencing at 9:02 a.m.)

 4          THE COURT:  We are here this morning in the matter

 5    of Michael Peluso versus the New Jersey Devils, LLC, et al.

 6    This is civil file number 17-1299.

 7          Let's begin by having Counsel note your appearances,

 8    please.

 9          MR. RUSERT:  Good morning, Your Honor.  Scott Rusert

10    from Nilan Johnson Lewis in Minneapolis appearing on behalf of

11    the New Jersey Devils and St. Louis Blues.  With me today are

12    my colleagues from Bryan Cave in St. Louis.  I will let them

13    introduce themselves, as well.

14          MR. SCHMIDT:  Good morning, Your Honor.  Good to see

15    you.  Chris Schmidt on behalf of St. Louis Blues and New

16    Jersey Devils.

17          THE COURT:  Thank you.  Nice to see you.

18          MR. POTTS:  Good morning, Your Honor.  Jonathan

19    Potts on behalf of the St. Louis Blues and New Jersey Devils.

20          MR. O'MEARA:  Good morning, Your Honor.  Shamus

21    O'Meara on behalf of Chubb Holdings and Federal.

22          MR. AZMAN:  Good morning, Mark Azman on behalf of

23    Chubb and Federal, as well.

24          THE COURT:  I must say we have good weather for you

25    guys coming to town (laughter).
```

1          MR. RUSERT:  It wasn't looking like it was going to

2    play out that way based on yesterday's forecast.

3          MR. STUCKEY:  Good morning, Your Honor.  Shawn

4    Stuckey on behalf of the Plaintiff.

5          MR. PHAM:  Good morning, Your Honor.  Hieu Pham on

6    behalf of the Plaintiff.

7          THE PLAINTIFF:  Mike Peluso.  Thank you.

8          THE COURT:  Very good.  All right.

9          We have two motions this morning.  We have a motion

10   to dismiss by Chubb and Federal and a motion to dismiss by the

11   New Jersey Devils.

12         Do you have a preference, Mr. Schmidt, about how to

13   proceed, or Mr. Rusert?

14         MR. RUSERT:  Yes, Your Honor.  Our intention was for

15   the Clubs to go first.  Mr. Schmidt will present on behalf of

16   the Clubs.  And I wasn't sure how you were planning

17   logistically to set up the time, but we'd like to at least

18   reserve some time for rebuttal.  He doesn't expect his primary

19   argument --

20         THE COURT:  All right.  My only limitation is a

21   sentencing at 11, so I really should be done at about 10:30.

22   Okay?  All right.

23         MR. SCHMIDT:  Perfect.  Good morning.

24         Your Honor, this is at least the third case that

25   Mr. Peluso has brought against -- related to his claims from

1    injuries he suffered allegedly during his time playing for

2    different Clubs in the National Hockey League.  He, as you

3    know, was a former League class rep in the MDL class action

4    which was against the National Hockey League, not the Clubs.

5    He, in addition, has brought claims, worker comp claims, a

6    series of claims in California.  There's five separate claims

7    and also a serious and willful claim that is pending in

8    California.  And in addition, he's brought this claim before

9    this Court.

10          Your Honor, the Court does not have personal

11   jurisdiction to hear the claims, and I'd like to first begin

12   with those arguments.  If we focus first on the jurisdictional

13   facts, it's clear that Minnesota does not have a connection to

14   this dispute or to the Defendants who have been sued by

15   Mr. Peluso.

16          First, in December 18th, 1993, Peluso hit his head

17   on the ice and was hospitalized in Canada.  A couple months

18   later, Peluso, during a mini team vacation with his teammates,

19   they're out the night before, in the morning he is working out

20   before breakfast and suffers a grand mal seizure in Florida,

21   not Minnesota.  He is hospitalized in Florida, and on

22   February 14th, he comes back to New Jersey.  There's a New

23   York Times article that Mr. Peluso put into his pleadings

24   that -- in 1994, they are talking about both the grand mal

25   seizure and the concussion that he suffered back in 1993.

1    Later that day after that article came out, the New Jersey

2    Devils actually sent -- actually, their independent team

3    doctor, Dr. Barry Fisher, sent Peluso for a second medical

4    opinion, he saw a neurologist down in Florida.

5           He then sees a second neurologist in New Jersey,

6    Dr. Marvin Ruderman, for a second opinion.  And the Ruderman

7    report is cited in Peluso's Complaint, it is quoted

8    throughout, and there's a number of important findings,

9    including that Mr. Peluso's neurological condition was normal

10   at that time, that Dr. Ruderman believed he -- that Peluso

11   could participate in hockey games, but that Peluso understood

12   that there was still a risk of recurrent seizures and in the

13   current lawsuit really focuses on this sentence, whether --

14   namely that Dr. Peluso [sic] talked to Mr. Peluso that his

15   participation in playing hockey in itself does not pose an

16   excessive risk for the development of further seizures unless

17   he were to sustain head injuries.

18          The report demonstrates that Peluso and Ruderman

19   talked about these issues directly, the Devils were not

20   present, this was a second opinion, and this report is before

21   the Court.  Peluso in his Complaint states that he does not

22   remember the visit from 20 years ago between him and

23   Dr. Ruderman, but he does not deny it, and that's at paragraph

24   31.

25          For purposes of the jurisdictional analysis, the

1   relevant question is:  What is the contact between the forum

2   of Minnesota and the Defendants themselves?  In the relevant

3   time period, the New Jersey Devils never played a game in

4   Minnesota, the St. Louis Blues never played a game in

5   Minnesota.  In what is a -- somewhat of an irony for the

6   hockey state, Minnesota did not have a national hockey team at

7   all during the relevant time period.  There is simply no

8   connection to Minnesota in this dispute.

9        The burden of proof rests with Peluso and his

10  attorneys.  They have the obligation to come up with

11  allegations and more than allegations, Affidavits to

12  demonstrate that this Court has jurisdiction, and they have

13  not done so.  General jurisdiction simply does not apply.  As

14  in the *BNSF* case where BNSF had 2000 miles of railroads in the

15  state of Montana, 2000 employees, the Court said that's

16  insufficient.  It turns on, as you well know, principal place

17  of business and state of incorporation.  And for New Jersey

18  and Missouri, New Jersey is a New Jersey-incorporated entity

19  with its principal place of business in New Jersey, and the

20  Blues are Missouri entity with its principal place of business

21  in Missouri.  The only jurisdiction where general jurisdiction

22  is proper is Missouri for the Blues and New Jersey for the

23  Devils.

24       So the analysis really turns on specific

25  jurisdiction.  And the concerns -- this concerns the

1    relationship between each Defendant, the litigation, and the

2    forum state.  And the inquiry -- and I think this is really

3    the teaching of the recent *Bristol-Myers Squibb* decision is

4    the focus is on the Defendant's contacts, not on the

5    Plaintiff's contacts.  And here, there are no relevant

6    Defendant contacts for purposes of a personal jurisdiction

7    inquiry.  A Defendant must purposely avail itself of the forum

8    state.  Here, there's no evidence of that.  And the

9    relationship with the forum must arise out of the contacts

10   that the Defendant itself creates with the forum, and the

11   lawsuit must arise out of or relate to those contacts.

12           So, let's apply those basic personal jurisdiction

13   principles to this dispute.

14           Did the New Jersey Devils or Blues purposely avail

15   themselves of the laws of Minnesota?  No.

16           Did Peluso play hockey for the Devils or Blues in

17   Minnesota in this time period?  No.  In fact, he never did.

18           Did the Devils engage in any relevant activity in

19   Minnesota or did the Blues?  No.

20           And there, the *Walden* case teaches, also a U.S.

21   Supreme Court case, that it's insufficient for -- that a

22   Defendant allegedly causes foreseeable harm to a Minnesota

23   resident.  The *Walden* case is U.S. Supreme Court case from

24   2014, and it teaches that the Plaintiff cannot be the only

25   link between the Defendant and the forum; rather, it is the

1   Defendant's conduct that must form the necessary connection

2   with the forum state that is the basis for its jurisdiction

3   over him.  And the Court concludes, after analyzing Supreme

4   Court precedent, it is the Defendant, not the Plaintiff or

5   third-parties, who must create contacts with the forum state.

6           In this case, the applications of these principles

7   is clear, Petitioner's relevant conduct -- and this was a

8   police officer in the *Walden* case who searched Nevada

9   residents as they're boarding a plane, he -- it's an improper

10  search, they bring a *Bivens* action, he kept the money, he knew

11  that they were Nevada residents going back to Nevada and there

12  could be foreseeable harm in Nevada, and the Court said that's

13  not enough.  Petitioner's relevant conduct occurred entirely

14  in Georgia and the mere fact that his conduct affected

15  Plaintiffs with the connections in the forum state does not

16  suffice to authorize jurisdiction.

17          There simply is not specific jurisdiction over the

18  claims in this case.  The one -- the one fact that Peluso has

19  asserted is that he entered into a contract in the State of

20  Minnesota.  And here, he does not allege that the Devils

21  entered the contract in the State of Minnesota.  The Blues

22  never signed that contract, in any event.  But this is a tort

23  case, not a contract case, so the contract is not the relevant

24  inquiry.

25          And then if we go to the *Burger King* case, which is

1    another U.S. Supreme Court case, even if the -- this was a

2    contract dispute, which it is not, the *Burger King* case and

3    subsequent U.S. Supreme Court cases have squarely addressed

4    this question.  If the question is whether an individual's

5    contract with an out-of-state party alone can automatically

6    establish sufficient minimum contacts in the other party's

7    home forum, we believe the answer clearly is that it cannot.

8    *K-V Pharmaceutical*, U.S. Supreme Court case also cited in our

9    briefs, reached the same conclusion.

10           Your Honor, there simply is not jurisdiction over

11   the Blues or Devils, and that really ends the inquiry.  The

12   Court need not go further with the analysis.

13           I would like to take the Court, though, through a

14   couple more points.  So, one of the claims is a spoliation

15   claim that has been brought against all of the Defendants.

16   The law of California and Minnesota and every relevant

17   jurisdiction is that is not a valid separate cause of action.

18   Instead, that claim must be brought before the Judge hearing

19   the alleged spoliation claims.  And that's taught in the

20   *Cedars-Sinai* case, the *Rosen* case, the *Coprich* case all cited

21   in our briefs.  They're all in accord.

22           Plaintiff's counsel did cite some prior cases that

23   have -- that predate the seminal cases that have since been

24   overruled.  And the takeaway is the Court has plenary

25   authority to decide any spoliation or discovery abuses before

1  the Court.  And, in fact, that dispute is ongoing before the

2  worker comp court in California.  It's not only a part of the

3  underlying claim, it's part of an S&W claim.  And there, what

4  the parties are fighting over is, since the Blues and Devils

5  have been made aware of this allegation, they -- there's

6  evidence that the Ruderman report was produced in 1999 in

7  connection with a former disability claim in which Peluso

8  signed a release and received compensation.  While the Blues

9  and Devils weren't even a party to the disability claim, they

10 were subpoenaed by Peluso's lawyers and turned over all their

11 medical records, including the Ruderman report.

12        The Ruderman report was produced as part of this MDL

13 proceeding, as part of the very first production by any of the

14 Clubs back in April of 2015, and turned over to Peluso's

15 lawyers in that proceeding.  And, of course, the Ruderman

16 report on its face demonstrates that the two parties discussed

17 everything in the report one-on-one and Dr. Ruderman submitted

18 an Affidavit in the context of the worker comp proceeding in

19 California to those issues.  All of those factual issues that

20 are still in play need to be resolved by the worker comp

21 tribunal in California, not this Court.  In any event, there

22 is no independent cause of action for a spoliation claim.

23        I'd like to turn briefly to the other claims in his

24 lawsuit.  And what's clear is that the worker comp regime

25 provides an exclusive remedy to Mr. Peluso in his claims.

1     Peluso -- Peluso and the Clubs agree that Minnesota law does

2     not apply. Peluso believes that California law should apply,

3     the Clubs believe that New Jersey and Missouri law should

4     apply. But in any event, with respect to Peluso and the

5     Clubs, this further confirms there's no personal jurisdiction

6     in Minnesota. Peluso -- let's turn to California law first

7     and the worker comp regime; that's the law that Mr. Peluso

8     believes should apply.

9             There's three statutory exceptions: Willful

10     physical assault, products liability, and fraudulent

11     concealment. Willful physical assault requires an actual

12     intent to injure in a physical assault by the employer to the

13     employee. There's simply no allegations. It's not a

14     colorable claim to support the willful physical assault

15     exception. The products liability exception requires a couple

16     of key factors: One, the employee must be injured by an

17     employer's product in his role as a consumer, not as an

18     employee. That's not the case here; Mr. Peluso was an

19     employee. And more importantly, there's no product at issue.

20             So, if we turn to the fraudulent concealment

21     exception, this is a narrowly-construed exception under

22     California law, and what California courts have determined is

23     that you -- the employer must conceal the existence of the

24     injury, not the existence of risk to state a claim. This is

25     not like what I -- what we're probably most used to in dealing

1    with fraudulent concealment in the discovery context where

2    it's a broader, looser definition.  It's very narrow and

3    strictly construed.

4           And the Courts have uniformly held in *Evans*,

5    *Rodriguez*, *Jensen*, *Hughes*, and others that it must be a

6    concealment of existence of injury.  Peluso's own Complaint

7    includes the 1994 New York Times article talking about both

8    his 1993 concussion and the grand mal seizure.  He knew about

9    the grand mal seizure and his prior concussion and

10   hospitalization back in 1993.  And if we turn to the *Evans*

11   case, just one of many cases finding for this, this is a

12   recent 2017 case in California involving two professional

13   sports players and the -- one of the professional athletes

14   allege that he was prescribed inflammatory -- or heart drugs

15   that had side effects with bad heart risk and was not informed

16   of those risks.  It was prescribed over and over, these

17   medications, and he ended up having to undergo heart surgery.

18   And the Court found that, again, to lose the protection of the

19   worker compensation exclusivity, the Chargers in that case,

20   must have concealed knowledge of Walker's underlying

21   work-related injury from him.  And the Court simply found that

22   there was no concealment of the underlying injury.

23          Again in the *Jensen* case, the Court similarly

24   addressed this issue and held the same way and explained, we

25   agree that the exception is extremely limited but it is

1   intended to be so.  And it makes sense when you consider the

2   overall statutory construct of the worker comp regime where

3   it's a strict liability setting for employees to have recovery

4   for workplace injuries.  And in California even more there's

5   this serious and willful component where if an employee is

6   able to prove that somehow an employer was reckless or wanton

7   or serious or willful, he has a whole separate claim within

8   the worker comp regime to address those allegations.

9           If we -- we turn to New Jersey and Missouri, they

10  similarly follow the virtual certainty standard.  And under

11  their standard, there must be -- the employer must have

12  intentionally acted to try and harm the employee with a

13  virtual certainty that that harm would result.  And the Courts

14  have uniformly held that reckless or wanton behavior is not

15  enough; it must be intentional.  And the mere possibility of

16  risk, even the strong probability of risk, is just not enough.

17  So if we turn back to our facts, this couldn't be further from

18  our case.

19          We have a case where Mr. Peluso saw a neurologist

20  down in Florida, he came back to New Jersey and was sent to

21  see a second opinion neurologist five days later in New

22  Jersey.  Then according to his Complaint, Barry Fisher, the

23  independent team doctor, met with Peluso, in following

24  Dr. Ruderman's report which cleared Peluso for play, also

25  cleared Mr. Peluso for play.  There's simply no fraudulent

1   concealment within either California law or the laws of New

2   Jersey or Missouri.

3         If we turn then to the abstention and primary

4   jurisdiction arguments, the teaching of all of these different

5   doctrines and the related doctrines that essentially stand for

6   the proposition that the Court should defer to the complex

7   regulatory environment of a worker comp proceeding and should

8   not intervene in those cases.  And there are a number of

9   cases, especially in the primary jurisdiction doctrine, that

10  stand for that proposition.  We've cited those in our briefing

11  and Chubb has cited similar cases.

12        If we look at the *Killian* case, for example, under

13  the primary jurisdiction doctrine, courts will not decide a

14  controversy involving a question within the jurisdiction of an

15  administrative tribunal until after that tribunal has rendered

16  its decision.  And that was a worker comp case, as well, where

17  the Federal Court or the State Court refused to intervene in a

18  worker comp proceeding in light of the primary jurisdiction

19  doctrine.  Here, this Court should dismiss and allow the

20  worker comp regime to run its course.  The same factual

21  allegations are at issue.  And, in fact, we have this serious

22  and willful claim where the exact same factual allegations

23  that are brought before this Court have been asserted in the

24  context of the serious and willful claim.  And why that is

25  important is Mr. Peluso has a remedy, he has a remedy within

1    the worker comp regime, he has a remedy if he's able to prove

2    his serious and willful claims within the worker comp regime,

3    he also has a potential remedy within the MDL as a -- as part

4    of the class even though he's no longer a league class

5    representative.

6            As a result, Your Honor, this Court simply does not

7    have jurisdiction to hear his claims.  Even if the Court had

8    jurisdiction, the exclusive worker comp regimes would bar this

9    Court from hearing those claims, and the teachings of *Colorado*

10   *River*, *Buford* abstention, and the primary jurisdiction

11   doctrine, courts all across the country regularly refer to

12   worker comp regimes and allow those courts to deal with these

13   important issues.

14           As a result, Your Honor, we respectfully request

15   that this Court dismiss these claims and allow Mr. Peluso to

16   proceed with his worker comp case.  Thank you.

17           THE COURT:  Thank you.

18           Mr. Stuckey.

19           MR. STUCKEY:  Thank you, Your Honor.

20           THE COURT:  Good morning.

21           MR. STUCKEY:  Good morning.  My colleague and I, we

22   were trying to figure out exactly how we were going to address

23   the motions brought by the Defendants and we thought that

24   maybe Chubb was going to go first and so I got prepared for

25   Chubb and now I'm all discombobulated.

1          THE COURT:  Oh, I'll bet you can pull it together.

2          MR. STUCKEY:  But it's going to be a little bit --

3   I'm going to take about half of the points that the Defendant

4   just raised and my colleague is going to take the other half.

5          THE COURT:  That's fine.

6          MR. STUCKEY:  I think one of the most telling

7   statements that the Defendant just made was, shortly before he

8   left, he said, quote, if you turn back to our facts, unquote.

9   They did a great job of putting up what were their facts.  And

10  in their reply, I know that they went to great lengths to

11  explain what the relevant facts were.  But we are in a

12  position now where it's the facts that are in the well-pleaded

13  Complaint that control; and therefore all of the facts that

14  the Defendants are asking the Court to rely on to see things

15  their way is not the way that it works at a motion to dismiss

16  stage.

17         We all know that at this point, the Plaintiffs get

18  the benefit of every inference that the Complaint alleges, and

19  we get the benefit of all the well-pleaded facts being true.

20  It also means that the time to debate the different versions

21  of the facts that are put forth by the Defendant just a few

22  seconds ago is not now.

23         THE COURT:  I agree with that, except, of course,

24  because I'm -- have to determine whether I have personal

25  jurisdiction, I can look at facts outside the pleadings.  But

1   you're right, the inferences are considered in your favor.

2           MR. STUCKEY:  Thank you, Your Honor.

3           So I want to start and just address the, what I

4   believe my -- what the Defendant believes is the strongest

5   argument that they have here, the strongest defense that they

6   have, and that's personal jurisdiction, specifically specific

7   jurisdiction.  And at the outset, let me be clear:  Unlike

8   what my -- what the Defendants have said, this case is not

9   just about one document, it's not about one event, it's not

10  about one bad act; it's about several instances of concealment

11  and withholding of documents, all of which caused a Minnesota

12  resident to suffer injury, aggravation of that injury, and

13  evidence of which came to light only based on actions that

14  occurred right here in Minnesota.

15          To explain further, up until September 1st of this

16  year, the single most event that occurred in Mr. Peluso's

17  life -- and I would say one of the most important events that

18  has occurred in my career as an attorney representing

19  professional athletes my entire career -- occurred here in

20  Minnesota.  And not just in the state of Minnesota, but here

21  in this very court in St. Paul.  That event occurred in May of

22  2016.  Mr. Peluso's case was coming up for trial in

23  California; and when I was reviewing his documents, what

24  caught my attention was that Mr. Peluso was sure that he had a

25  grand mal seizure during his playing clear but there were no

1    documents supporting this.

2         The Defendants in the workers' compensation case had

3    made statements that Mr. Peluso's seizure condition was not

4    industrial, meaning it wasn't caused by hockey.  The

5    Defendants' doctors were saying that his condition was not

6    industrial and, further, that he had never had concussions

7    when he played and that, if anything, Mr. Peluso's condition

8    was due to drinking and dehydration.  In May, I reached out to

9    a colleague who is a lawyer in the *NHL Concussions* case here

10   in Minnesota and I asked him if he had any documents that were

11   not subject to protective orders that were relevant to

12   Mr. Peluso, and he said, yes, he had some very compelling

13   documents.

14        So I asked him to provide those documents to me, and

15   assuming that they were known documents, since none had been

16   provided to Mr. Peluso since 1994, I was incredibly surprised

17   that when, in response, I was provided with two medical

18   records that were produced pursuant to a demand for production

19   of documents made in this very court.  I'm not sure if it was

20   related to Your Honor's order compelling Chubb Insurance

21   Company to produce documents or if it was related to a demand

22   of documents on the NHL teams, but I suppose that would be an

23   issue that would be left for discovery.  But I do know that I

24   have never seen nor been provided these very important medical

25   reports prior to that moment.  And the documents that have

1   been going on for just a little bit were a December 18th,

2   1993, New Jersey Devils medical report demonstrating that

3   Mr. Peluso had a devastating concussion and was hospitalized;

4   and then a February 21st, 1994, neurological report from

5   Dr. Marvin Ruderman stating, among other things, that

6   Mr. Peluso had a grand mal seizure.  So that was finally

7   confirmed, that his seizure was a direct result of the

8   December 18th, 1993, concussion, and an internally

9   irreconcilable statement that Mr. Peluso would not have a

10  chronic seizure condition if he never sustained another head

11  injury, a feat virtually impossible for any hockey player and

12  literally impossible for an enforcer, which is Mr. Peluso's

13  position.

14          That report was sent to the general manager,

15  Lamoriello; Barry Fisher, the team doctor; and the team

16  orthopedic surgeon.  However, notably, Mr. Peluso, who could

17  have very easily been cc'd on a document, was not and never

18  knew the document nor the contents existed until then.  The

19  report had been withheld from Mr. Peluso for 20-plus years and

20  never produced, despite multiple forums of requests for

21  documents made to Defendants.  But the important thing is that

22  that occurred here in Minnesota, and October 10th of 2017,

23  this Court issued a decision --

24          THE COURT:  What occurred here in Minnesota?

25          MR. STUCKEY:  The production of documents.

1          THE COURT:  Okay.  But I don't know of any case law

2     that considers that factor in evaluating the connection

3     between a Defendant and a forum.  Are you?

4          MR. STUCKEY:  Well, I think that when you consider

5     all of the relevant circumstances and all of the relevant

6     contacts, that is going to be a compelling contact to

7     consider.  The Court issued its decision in *McGill versus*

8     *Conwed* which analyzed the temporal limitation in the Eighth

9     Circuit case -- and I hope I say this correct -- but *Pecoraro*,

10    *Pecoraro versus Sky Ranch*.  *Pecoraro*'s temporal limitation

11    basically said that the timing of the acts that create the

12    minimum contacts with the forum state must exist -- quote,

13    must exist either at the time of cause of action arose, the

14    time the suit is filed, or within a reasonable period of time

15    immediately prior to the filing of the lawsuit.

16          I do not believe that any of Defendants cited this

17    case, so I just want to address that test here right now.  In

18    a nutshell, the most significant acts and events which had

19    occurred in all of Mr. Peluso's cases happened right here in

20    Minnesota in this very District a little over a year ago.

21    After years of concealing medical records from Mr. Peluso

22    while he lived in Minnesota, the concealment then moved to

23    this Court when the concealed documents were voluntarily

24    produced to this Court but continued to be withheld until they

25    were handed over to me.  This conduct directly related to this

1    Minnesota forum, was aptly described by workers' compensation

2    appeals panel as conduct that was, quote, inexplicable,

3    unquote, and, quote, dereliction of the New Jersey Devils and

4    Chubb Insurance's discovery obligations, unquote.

5            The Chubb Defendants cite in their reply brief the

6    U.S. Supreme Court case of *Bristol-Myers* for the proposition

7    that specific jurisdiction requires, quote, principally an

8    activity or an occurrence that takes place in the forum state.

9    The Defendants also cite *Walden* which was mentioned just a few

10   minutes ago for, quote, the proper question is whether the

11   Defendant's conduct connects him to the forum in a meaningful

12   way.  And finally, Defendants cite *Calder* to show that unlike

13   the California Plaintiff in *Calder*, that here, quote, the

14   allegations in this case merely connect Defendants with a

15   Plaintiff living here, not to Minnesota.

16           However, here, it was Defendant's conduct that

17   resulted in the concealment of the documents.  It was

18   Defendant's conduct that resulted in the concealed medical

19   records that were produced here in Minnesota.  This was

20   clearly an activity or an occurrence taking place in Minnesota

21   in the forum state, and this conduct clearly connected

22   Defendant's actions to Minnesota.  The allegations in this

23   case do not merely connect Defendants with a Plaintiff living

24   here; Defendant's conduct would connect Defendants with

25   Minnesota regardless of whether Mr. Peluso lived in Minnesota,

1    in California, or Alaska.  Indeed, if for some reason

2    Defendants wanted to continue concealing the documents after

3    they were produced here in Minnesota, they would have had to

4    avail themselves of the laws and protections of this Court in

5    order to do so.

6            Your Honor, there's one thing that I may need your

7    guidance a little bit in addressing, and that is that

8    September 1st, the reason I said that the most important thing

9    happened in Mr. Peluso's case prior to September 1st was

10   because September 1st we were produced with about 45 records

11   that had never before been produced to us.  Some were produced

12   by the Defendants, others were produced by Defendants in the

13   workers' compensation case.  And what those documents showed

14   was that they're -- back in 1994 when Mr. Peluso first had his

15   seizure, he actually went to see a neurologist.  February 14th

16   is when he had his first grand mal seizure, he goes to see a

17   neurologist, neurologist gives him an EEG, and the EEG showed

18   that he has front temporal lobe damage.

19           What that means is -- and I had to become very

20   familiar with seizures in order to understand this -- in order

21   for a neurologist to properly diagnose and treat someone with

22   a seizure, they have to know the cause of the seizure.  If the

23   cause is -- there are three types of seizures.  There's

24   genetic, there's a generalized seizure disorder, and then

25   there is a --

1          THE COURT:  Probably some sort of trauma-induced

2     or --

3          MR. STUCKEY:  That's right.  There's a key word for

4     it that I was told from the neurologist that I am going to

5     feel very smart in saying, but it's called focal epileptic

6     seizure, post-traumatic.  And the significance of this is when

7     the seizure is diagnosed, there is a certain regimen of

8     medications that must be given.  And if that seizure -- if the

9     right medications are given, particularly if it's one that is

10    induced by trauma, then it will virtually eliminate the chance

11    that that person will continue to have seizures or will be at

12    risk for a chronic seizure disorder.

13         That obviously did not happen to Mr. Peluso.  It did

14    not happen because his doctors were trying to figure out what

15    the cause was but they had no documents and they had no way of

16    being able to connect his seizure disorder with what actually

17    happened while he was playing.  In fact, there are references

18    throughout his medical reports from his treating doctors where

19    they referred to his seizure as a "generalized seizure

20    disorder" instead of the proper diagnosis.

21         The importance to this is, had those documents been

22    produced to Mr. Peluso back in 1994 or been produced to him in

23    2000 when he finished playing hockey, his doctor -- and we

24    have some wonderful physicians here in Minnesota, his doctor

25    would have been able to properly diagnose it so that he would

1   not continue to have further seizures after that.  That did

2   not happen, and his one seizure prior to 2000 turned into --

3   his one grand mal seizure prior to 2000 turned into eight

4   grand mal seizures after 2000.  And that means that every

5   single time that he had a seizure, every time it made his

6   life -- it put his life more at risk for dying, that was a

7   result of the Defendant's actions, and the Defendant's actions

8   reached into Minnesota every time that happened again.  And

9   that continued to happen all the way through until these

10  documents were finally produced to us, first in 2016 and now

11  finally September of 2017.

12          There was mention made that Mr. Peluso did not have

13  an actual injury at the time, that at the time of the Ruderman

14  report, that what was seen was only a risk of a seizure

15  disorder.  And this was made in relation to a concealment

16  argument that the Defendants were making or a consuming

17  defense.  And that's just not the case.  It's not the case

18  because when he did have the seizure and was diagnosed as

19  temporal lobe damage, that in and of itself created an injury

20  and the injury was called a post-traumatic epileptic seizure

21  disorder as a result of a traumatic brain injury.

22          At that point, the injury existed.  And in 1994,

23  later on that year he was given another test which showed that

24  he had very high creatine kinase, CK-BB, which is -- which are

25  levels that show that a person is -- that their seizure

1  disorder is in full effect.  These were all documents that

2  were never produced to us but never came to light until the

3  documents got to our hands from your court.

4      The other contacts that draws Mr. Peluso to this

5  Court, there was a release that was discussed and the release

6  is another document that was not produced to us until the end

7  of August and that came from the team Defendants.  And we

8  referenced it in our opposition papers because we did not have

9  that document in order to put it into the Complaint.  And the

10  Defendants have stated at first they were, it seemed that they

11  felt very strongly about that release because they cited in

12  the footnote in their moving papers and stated that

13  Mr. Peluso's claims were ultimately going to be -- against the

14  Clubs were ultimately going to be barred because that release

15  was with the Clubs.  Now they're making the argument that,

16  well, no, it's the NHL, it has nothing to do with the Clubs.

17  But, in fact, that release was a release that was entered into

18  in 2000 when Mr. Peluso was found to be permanently disabled

19  by the NHL and the NHL Clubs.

20      That release that Mr. Peluso signed was without the

21  benefit of having the actual neurological reports that showed

22  that he, in fact, had a seizure condition that was ongoing at

23  that point, that started in '94 and that was continuing.

24  That, in effect, was a fraudulent transaction.  The Defendants

25  fraudulently introduced [sic] Mr. Peluso into signing that

1   agreement because they did not provide to him all of the

2   relevant information, and that document was signed.  In fact,

3   it was notarized while Mr. Peluso was here in Minnesota.

4   There's the notary stamp right on the document.

5            That was a transaction between the team and the

6   players -- or the team and Mr. Peluso at that point.  That

7   created another contact to Minnesota.  The contracts that

8   Mr. Peluso signed -- and you have before you the NHL lawyers

9   and the NHL lawyers talked a lot about -- in a different case,

10  of course -- but they talked a lot about how the player

11  contracts actually controlled -- and this was with regard to

12  preemption -- but how the player contracts control the

13  healthcare and how the doctors, the duties that the doctors

14  had to disclose documents and the obligations that they had to

15  tell the team, et cetera, et cetera.  Well, all of

16  Mr. Peluso's contracts except for two with all of the

17  Defendants were signed in Minnesota.

18           There are multiple instances where the teams have

19  contracted back and forth at arm's length with Mr. Peluso and

20  have availed themselves of this forum, not only in '94 when he

21  was playing and he was hurt and injured at that point, but

22  also when he filed his workers' compensation case.  The teams

23  have voluntarily participated in a forum to provide healthcare

24  to him with him being here in Minnesota and the teams not

25  being here in Minnesota.  They have availed themselves of this

1    forum by doing that.

2            And just a few more points, Your Honor, and then

3    I'll allow my colleague to come up.  Going back to fraudulent

4    concealment, the first thing that you have to have with

5    fraudulent concealment is you have to have an injury.  And if

6    you have an injury, then -- and it's not -- it's not revealed

7    to the player, then that's fraudulent concealment.  Mr. Peluso

8    had an injury back at that time.  He was told by multiple

9    people that he did not have an injury.  He was told that it

10   was -- and this is a second part of proving a fraudulent

11   concealment claim.  If the true nature of the injury is hid

12   from the player, then it's fraudulent concealment.  And we

13   have multiple statements that we cite in our Complaints from

14   the Defendants.

15           In fact, the Defendants cited a statement from the

16   New York Times where Lamoriello, the general manager for the

17   Devils, said that Mr. Peluso's condition was due to

18   dehydration and was not due to concussions.  We have other

19   Defendants who -- and these were attorneys actually for Chubb

20   who stated on January 20th, 2017, that Peluso -- or quote,

21   Peluso has not offered any medical evidence to support the

22   allegations of brain damage and diagnosis of dementia.  So, I

23   have many more quotes here, but the point is that these -- it

24   was never revealed to him the true nature of his injury, and

25   it continued to be the case that, until now, that his injury

1    has been covered up and concealed.

2         Okay.  I think that I got all of the arguments that

3    were made by the Defendants.  And I'm now going to allow my

4    colleague to come up.

5         THE COURT:  Thank you.

6         MR. STUCKEY:  Thank you.

7         THE COURT:  Mr. Pham.

8         MR. PHAM:  Good morning, Your Honor.  Just to touch

9    briefly on personal jurisdiction a little bit more, the

10   Defendants point out certain discrete activities that have

11   happened and our client's employment with them, but you have

12   to understand his employment with both individual teams don't

13   happen in a vacuum.  Part of the actions which Defendants

14   directed at this forum and specifically at Mr. Peluso is that

15   they fraudulently induced him to continue playing to the end

16   of his contracts, and essentially after each season they would

17   inform him that he was cleared to play again which they knew

18   was false.  It was a continual ongoing fraud throughout the

19   course of his employment.  And as we cited in our opposition,

20   when you contract with a citizen of a certain state, wrong

21   that person in that state, it shouldn't surprise the Defendant

22   to be sued in that state, in this case Minnesota.

23        I'm just going to move on quickly to the Defendant's

24   abstention arguments, and this will also most -- a lot of it

25   will apply to Chubb's arguments --

1    THE COURT:  Before you get to that, is it fair for

2    me to characterize your personal jurisdiction argument to

3    being a *Calder* effects test argument?  Is that what you're

4    arguing?

5    MR. PHAM:  In part, yeah.  Yes.

6    THE COURT:  Okay.  Well, let's set aside *Calder*

7    effects then.  What would be the Defendant's contacts with the

8    State that would provide specific personal jurisdiction,

9    setting aside *Calder* effects?

10    MR. PHAM:  Aside from that, Your Honor, like I said,

11    employment with these teams don't happen in a vacuum, just

12    like an employee residing in a state, the employer contacts

13    the employee.  In the case of Mr. Peluso, his contracts

14    required him to perform activities within the forum state

15    itself.  It does not happen in a vacuum.  He doesn't just --

16    Mr. Peluso does not just play hockey games and show up at

17    practice.  There are off seasons and there are times when he's

18    directed and communications by the teams are specifically

19    directed at Mr. Peluso while he's here.

20    THE COURT:  Right.  But isn't the question under,

21    you know, that -- this law has changed dramatically in the

22    last decade.  Isn't the question one of the Defendant's

23    contacts with the forum?

24    MR. PHAM:  Yes, Your Honor.  But again, what I want

25    to point out is the Defendant does have direct contacts with

1    the forum --

2              THE COURT:  Because they're entered into an

3    employment contract with Mr. Peluso?  Is that what you're

4    relying on?

5              MR. PHAM:  Not entirely, but they also still used

6    Mr. Peluso to market to obviously the game of hockey while

7    still here.  Even while there's no actual team inside the

8    State of Minnesota, they still direct their activities for --

9    and have Mr. Peluso specifically market their product here, as

10   well.

11             So, going back, I'll just move ahead to arguments of

12   abstention.

13             THE COURT:  Okay.

14             MR. PHAM:  Essentially what it boils down to is the

15   almost -- pretty much every argument on abstention should fail

16   for one basic reason, and that is the claims brought in this

17   lawsuit are statutorily or judicially created outside the

18   framework of workers' compensation.  Just dealing with the

19   claims against the team Defendants, California Labor Code 3602

20   expressly provides a separate claim for Mr. Peluso to bring

21   that is explicitly outside the framework and outside the

22   purview of a workers' compensation judge.

23             Similarly, cases like *Unruh*, the California Supreme

24   Court, and *Jablonski* judicially have created a separate cause

25   of action that are unrelated and outside the purview of a

1  workers' compensation.

2         To address the fraudulent concealment, one thing I'd

3  like to point out is this claim is not about a discrete

4  injury.  It's not about the discrete concussion or seizure

5  that was suffered as the Defendants would like to have you

6  focus on.  It's actually about a more insidious underlying

7  seizure disorder and the concussion and the concussions that

8  they knew Mr. Peluso would suffer were precursors to CTE, to

9  early-onset dementia, and to Alzheimer's.  It's just like the

10 *Linton* case where -- where even though there's a symptom, or

11 in this case Mr. Peluso obviously knew he suffered a blow to

12 the head, he doesn't know that it was actually a precursor and

13 would lead to more insidious diseases.

14        In regards -- and in regards to New Jersey and

15 Missouri law, Defendants really focus in on their

16 interpretation of what their Ruderman letter actually says.

17 That's an analysis of the weight of the evidence and not

18 what's been alleged in the Complaint.

19        THE COURT:  I agree with you there.  I do.

20        MR. PHAM:  And in that sense, you know, the

21 Complaint alleges that they were certain that almost every

22 player would suffer these injuries and especially certain that

23 he, that Mr. Peluso, would obviously sustain further injuries

24 there.  And because these claims are provided for by statute

25 to take it out of the hands of the Workers' Compensation Board

1    in New Jersey, Missouri, and California, abstention really

2    shouldn't apply.  I point out that essentially abstention

3    should be rarely used, in only exceptional circumstances.  In

4    the case of *Buford*, it really would not interfere with an

5    existing statutory scheme because, like I said, it is

6    expressly removed from that scheme.  And same applies with

7    *Colorado River*.

8              I would just point out now that they're not -- Chubb

9    is not in a parallel proceeding with this case because they're

10   not parties to the serious and willful.  But even though

11   that's the case, the Workers' Compensation Appeals Board in

12   California, even if they were to come to a final conclusion,

13   there would be no -- it would not fully dispose of these

14   claims.  In fact, like I said, these claims were created

15   especially to be decided outside of that purview.

16             And the same applies for primary jurisdiction.  The

17   case that we cited, you know, where the claim is expressly

18   listed as outside that specific framework, it should not --

19   abstention should not apply.  I do want to differentiate that

20   the *Zurich* case the Defendants bring up where, you know,

21   abstention -- or at least staying the case was appropriate

22   related to workers' compensation case, that's incredibly

23   different from this case.  In the *Zurich* case, the Plaintiff's

24   claims were contingent on a final ruling of the workers' comp

25   board.  In this case, the workers' comp board, however they

1  find, won't have an effect because these claims are outside

2  that scope.

3      And I'll just address some of the -- you know, the

4  Defendants in the motion to dismiss essentially accuse

5  Mr. Peluso of claim-splitting, essentially just using this as

6  another chance to get another bite at the apple.  That's

7  simply not the case.  This case arose when new information was

8  discovered, and with that new information, triggered entirely

9  separate statutory and judicially-created claims.  That's it.

10      THE COURT:  Thank you so much.

11      Very brief response because we're going to run out

12  of time otherwise.

13      MR. SCHMIDT:  I was going to just see if it's okay

14  with the Court to let Shamus go next on behalf of Chubb and

15  then if I have any final comments.

16      THE COURT:  I think that makes sense.

17      MR. SCHMIDT:  Thank you, Your Honor.

18      THE COURT:  Very good.  All right.  We'll move on to

19  the motion to dismiss by Chubb and Federal.

20      MR. O'MEARA:  Thank you, Your Honor.  I will try not

21  to be repetitive.

22      This action, Your Honor, is a dressed-up discovery

23  dispute about a workers' compensation case in California.

24  Nothing more.  It's about the alleged failure to disclose a

25  medical report by Dr. Ruderman in the workers' compensation

1    case.  Nothing happened in Minnesota.  Complaint paragraphs 48
2    through 50 discuss the California workers' compensation
3    claims.  Chubb is a party to that action as delineated in the
4    Complaint.
5             Plaintiff claims concealment of a medical report
6    written in New Jersey for an exam that occurred in New Jersey.
7    And under the law, concealment occurs where the Defendant is
8    located.  The *Crane v. Shein* case, Northern District of
9    Illinois, as cited in our case.  Now, you mentioned the *Calder*
10   effects test; there are no contacts here under which Chubb
11   Holdings and Federal, the two parties that have been sued and
12   that we represent, show in any contacts of Minnesota.  There's
13   no unique or express contacts aimed at Minnesota.  There's no
14   contacts at all.
15            There's a lot of conclusory allegations and the
16   legal conclusions based upon pled facts.  But, Your Honor, I'm
17   sure as this Court well knows, you don't have to hold those
18   out as being true because they are conclusions, because
19   they're the conclusions of counsel in briefs based upon facts
20   that they've alleged.  There is no relationship between the
21   claims and the contacts in Minnesota.
22            Let me back up for a second.
23            THE COURT:  Which Chubb entity is a party to the
24   California workers' comp case?
25            MR. O'MEARA:  Pardon me, Your Honor?

1          THE COURT:  Which Chubb entity is a party in the

2   California workers' comp case.

3          MR. O'MEARA:  Is it Chubb Insurance, Mark?

4          MR. AZMAN:  Your Honor, I think it's technically

5   Federal and Chubb is receiving mail, if you will.  Federal is

6   the insuring entity for the workers' compensation matters.

7          THE COURT:  I see.  Okay.

8          MR. O'MEARA:  So, Your Honor, the reason why --

9          THE COURT:  So just for my own curiosity, in the

10  MDL, of course, Chubb was the party with the IMEs and the

11  workers' comp files, so explain to me the relationship there,

12  if you know.

13         COURT REPORTER:  Can you come up to the microphone?

14         MR. AZMAN:  Oh, yes.

15         THE COURT:  I just want to clear this notion that

16  Chubb Holdings isn't connected to this case.

17         MR. AZMAN:  Sure.  So Mark Azman for Defendants.

18         So, Federal, we've got an Affidavit in the file or

19  Declaration from one of our representatives in the court file

20  identifying that Federal is the insuring entity.  They issued

21  the insurance policies that insured the teams for the work

22  comp exposure beginning in I think it's January 1 of 1994

23  through basically current.  And so that's really the

24  responding entity.  Now, in the work comp proceedings, you

25  know, there's letterhead documents from Chubb that say "Chubb"

```
 1   or --
 2              THE COURT:  What is the relationship?  Explain to
 3   me --
 4              MR. AZMAN:  It's a parent-subsidiary relationship --
 5              THE COURT:  That's it, okay.
 6              MR. AZMAN:  -- so Chubb -- basically Chubb Limited,
 7   I believe, is the global parent corporation.  Underneath that,
 8   there's literally hundreds of subsidiaries that Chubb operates
 9   through globally in over 50 countries worldwide.
10              THE COURT:  So in the MDL action when Chubb was such
11   a big player, it was really Federal insuring the workers'
12   comp?
13              MR. AZMAN:  That's -- yes.
14              THE COURT:  Okay.  All right.  That's news to me
15   because in the MDL, we only dealt with Chubb and Chubb had the
16   workers' comp records, I thought.
17              MR. AZMAN:  It's probably more -- generically
18   because Federal is a Chubb-owned entity that people may have
19   referred to Chubb --
20              THE COURT:  So there's no need to clarify that in
21   the MDL there.
22              MR. AZMAN:  Probably not.
23              THE COURT:  Okay.  All right.  That's just what I
24   understand.
25              Okay.  I'm sorry.  Go ahead.
```

1      MR. O'MEARA:  So, Your Honor, let's talk about the

2   parties that have been sued.  Chubb Group Holdings, Inc. and

3   Federal Insurance Company, and that's who we represent -- I'll

4   try to reference them as "Chubb Holdings" and "Federal" for

5   clarity -- they're the only two parties that have been sued.

6   And there's a lot of noise trying to be created by

7   Mr. Peluso's lawyers by the submission of some business

8   records for nonparties.  Those nonparties have nothing to do

9   with the parties that have been sued, and there is no showing

10  in the Affidavit of Mr. Stuckey that connects in any way those

11  other entities, those nonparties, with Chubb Holdings and

12  Federal.

13      THE COURT:  And are those other parties, those are

14  other Chubb subsidiaries?  Is that what they are?

15      MR. O'MEARA:  I have no idea who they are.  There's

16  a couple of references in some Internet records that are in

17  Mr. Stuckey's Affidavit that have the word "Chubb."  I don't

18  know if they are financial institutions.  I don't know if

19  they're automotive parts businesses.  I have no idea, and

20  neither does Mr. Stuckey.  You know, he submitted one document

21  from Barrons.com or Bloomberg.com about a subsidiary

22  relationship between, I think, Chubb & Sons and a separate

23  holding company that has no relation to Chubb Holdings, Inc.

24  in this case.

25      And the reason I mention that, Your Honor, is

1    because of what the teams lawyers have discussed and also, I

2    think, what the lawyers for Mr. Peluso have discussed, which

3    is the focus is on the Defendants.  The focus isn't on

4    nonparties.  The focus is on what activities, if any, did we

5    direct to the forum state, to Minnesota.

6          We're allowed in this Rule 12 setting, Your Honor,

7    to submit Affidavits as part of our motion.  We submitted the

8    Affidavit from the VP and Technical Officer for Chubb

9    Holdings.  And his Affidavit, which is not disputed in any

10   regard by the Plaintiffs as I read the record, indicates some

11   very compelling information.  Chubb Holdings is incorporated

12   in Delaware with its principal place of business in New York.

13   Chubb Holdings is not an insurer; did not issue insurance

14   policies; is not licensed to sell insurance in the State of

15   Minnesota; is not a surplus-lines insurer in Minnesota; does

16   not sell or market any insurance products in Minnesota; has

17   not issued insurance policies to insureds within Minnesota;

18   has not issued an insurance policy, including work comp and

19   employer liability insurance to any NHL team, including the

20   Blues and the Devils; has no employees or offices in

21   Minnesota; pays no claims to persons located in Minnesota; has

22   no assumed names or aliases, including all the aliases that

23   they stuck on the caption.  Those are -- that's not us.

24         We're Chubb Holdings, Inc., and it is not otherwise

25   known by any name other than Chubb Holdings, Inc.  There's no

1    basis for Chubb Holdings to be in a lawsuit and Chubb Holdings

2    should be dismissed outright.

3          Mr. Ryan also states that Federal is incorporated in

4    Indiana with its principal place of business in New Jersey.

5    It's a subsidiary of Chubb INA Holdings, Inc., which is a

6    Delaware Corp.  And I think important to the national analysis

7    articulated by the recent Supreme Court *juris prudence*, Your

8    Honor, Federal is licensed in all 50 states, including

9    Minnesota; has no offices or employees in Minnesota; and in

10   2016 it's direct written premium was 1.8 percent of its total

11   premium nationwide and those, there are very similar numbers

12   for direct written premium; has very low percentages in

13   relation to the total in the prior four years.  And that's in

14   Mr. Ryan's Affidavit.

15         And also with respect to losses paid, the losses

16   paid in 2016 in Minnesota by Federal were .89 percent of what

17   they paid nationally.  And in the prior four years, it runs

18   from about 1.04 to 2.22 percent.  That's important when you

19   take a look at what *Daimler* and *Bristol-Myers* and everybody

20   else, the other cases, the more recent cases, are saying which

21   is you have to do an appraisal not just of what the contacts

22   are in Minnesota but what they are nationally and even

23   worldwide.

24         Now, as Mr. Asmus said, Federal did issue work comp

25   and employer liability policies to the Devils and to the Blues

1    starting on January 1, 1994, and renewing annually to date.

2    That's kind of the backdrop for personal jurisdiction.  The

3    general jurisdiction arguments by the Plaintiff are really

4    unavailing.  We're not at home in Minnesota.  The paradigm

5    forums for us are Delaware, Indiana, New York, and New Jersey

6    where we have our home offices and principal place of

7    business.

8          There are no -- this isn't the rare case articulated

9    in the *Tyrrell*, the *Burlington Northern versus Tyrrell* case

10    where there are shown -- where the Plaintiff has shown

11    continuous or systematic contacts with the forum, with

12    Minnesota.  In *Tyrrell*, the Court rejected personal

13    jurisdiction with regard to a railroad that had 2000 miles of

14    tracks in Montana, about 6 percent of its track capacity

15    nationwide, and I think maybe 5 percent of its employees were

16    located in Montana, and maybe 10 percent of its revenue was

17    generated in Montana.  And the Court in *Tyrrell* said that's

18    not enough for personal jurisdiction, for general personal

19    jurisdiction.  And that's really the case here.

20          For Chubb, there's nothing.  And for Minnesota, it's

21    1 or 2 percent with regard to Federal.  In relation to

22    national, I think that's a very relevant analysis in

23    particular when you look at *Bristol-Myers* and *Daimler* and

24    *Tyrrell*.  So, instead what do they do?  They submit the

25    business filings, including agents of service for process for

1    five business -- for five nonparties.  And that's simply not

2    what they're supposed to be doing.  They're supposed to be

3    looking at us, Chubb Holdings and Federal, and try to show the

4    Court that our activities, ours, Chubb Holdings and Federal's,

5    were directed toward Minnesota.  What they're trying to do is

6    shoehorn that proof in through five nonparties with some

7    business filings and online records.

8          So, when they say things like we were fraudulent or

9    we were negligent or we had continuous or systematic contacts

10    and they're parroting the language of personal jurisdiction,

11    that amounts to really rank speculation and conclusion when

12    they have no specific facts.

13          The Ruderman report wasn't even given to my clients.

14    If you take a look at my Declaration, I have a copy of the

15    parts of the -- of Dr. Ruderman's report that is edited by

16    Mr. Stuckey's office and they say right on that document --

17    can we change this over (referring to courtroom technology)?

18          THE COURT:  We need to change it over.  Yeah.

19          Oh, there we got it.  Okay.  Good job, Leah.

20          All right.

21          MR. O'MEARA:  Report was sent -- report was sent to

22    Devils' GM and team doctor, and neurologist was retained by

23    the Devils.  The cc's have nothing to do with our clients,

24    Your Honor.

25          So, I think we have to be really careful, with due

1    respect, Your Honor, when we take a look at what the Plaintiff

2    is alleging in relation to concealment and what they say we

3    knew or what they say was our intent.  And while I'm on the --

4    while I'm on the report, this is what is at issue:  "I believe

5    that he may participate in hockey games with the New Jersey

6    Devils, but he understands that there is still a risk of

7    recurrent seizures."

8            That document, that Ruderman report, is held up and

9    highlighted significantly in the Complaint, and I submit that

10   the Plaintiff admits the contents within it for all purposes.

11   The fact that Mr. Peluso understandably 23 years later says he

12   doesn't remember seeing this doctor or the other allegations

13   in the Complaint doesn't mean that he, for purposes of this

14   lawsuit, doesn't admit the truth of the report.  It is what it

15   is.  It's a contemporaneous document that is a critical aspect

16   of the Complaint.  It's the reason why we're here.  They say

17   we concealed it, but that's what the report says.

18           THE COURT:  But the Court doesn't have to rule on

19   the merits and won't on -- at this point.

20           MR. O'MEARA:  I'm sorry?

21           THE COURT:  The Court doesn't have to rule on the

22   merits of that controversy to determine personal jurisdiction.

23           MR. O'MEARA:  That's true, Your Honor.  I guess what

24   I'm saying is the Court -- the Court can look at this report

25   because it's embraced by the Complaint.

1          THE COURT:  The Court can look at this report

2     because this is a jurisdictional question and I don't -- I'm

3     not limited to what's embraced by the Complaint.  But I have

4     to consider all inferences at this stage in favor of the

5     Plaintiffs.  But this controversy I don't think really matters

6     for the analysis.

7          MR. O'MEARA:  For personal jurisdiction.  For

8     statute of limitations, I think our position is that's

9     accrual, that's actual notice --

10          THE COURT:  Yeah, but --

11          MR. O'MEARA:  -- and that's --

12          THE COURT:  -- this Court is not going to rule on

13     statute of limitations now.

14          MR. O'MEARA:  I understand.

15          So, the other point that I think is posed by

16     Mr. Peluso, counsel for Mr. Peluso, is the fact that we

17     submitted Mr. Ryan's Affidavit.  We're entitled to do that

18     under the case law with regard to Rule 12 motions.  And I

19     think the Court can be informed with regard to that

20     information in order to conduct the appraisal that our Supreme

21     Court *juris prudence* -- Supreme Court *juris prudence* suggests

22     which is take a look at what our contacts are like in

23     Minnesota with respect to Federal in relation to what Federal

24     is doing nationally.

25          THE COURT:  I agree with that, yeah.

1          MR. O'MEARA:  And just a last point about really

2    specific personal jurisdiction, the due process limitations on

3    really the adjudicative authority of courts here and elsewhere

4    is principally to protect the liberty of the nonresident

5    Defendant.  It is not for the convenience of the Plaintiffs.

6    That's why we undertake these analysis, Your Honor, to

7    determine whether there is the sufficient contract -- contacts

8    in the context of due process in order for the Court to

9    determine whether it can hear the case.  And so with respect

10   to, you know, all of the arguments, I think that that's really

11   an important focus.  It is, are we being protected within the

12   confines of due process in relation to our nonresident status?

13          There's an issue about consent.  They say that Chubb

14   Holdings and Federal have consented really vis-à-vis the

15   business filings, the agents for service documents of five

16   nonparties.  The *Perrigo v. Merial* case that we cited, 2013

17   decision, District Court of Nebraska, really says that you

18   can't use these non-party businesses in order to impute

19   consent to a named party.  The *Knowlton versus Allied Van Line*

20   case cited by the Plaintiffs involved the named Defendants

21   appointing their agents for service of process.  That's not

22   what's going on here.  They're using non-party agent for

23   service, business filings that they found on the Internet or

24   the Secretary of State's office to suggest that that means

25   that we, Chubb Holdings and Federal, consented.  And that's

1    simply not the case, and *Knowlton* has been rejected by many

2    decisions and we've provided those.

3            Briefly a point about abstention, primary

4    jurisdiction, and first-filed, and also direct action.  This

5    is a California workers' compensation dispute being dressed up

6    as a federal lawsuit.  There is a complex regulatory scheme

7    that is annunciated in any number of California cases stating

8    that work comp is that regulatory scheme.  And under the

9    *Buford* case and the *Colorado River* case, the Court, as an

10   option, can abstain from hearing this case and deferring to

11   the California workers' compensation court and the myriad of

12   filings and the years' long process that's gone on there and

13   not have to deal with really the same issues now.

14           It's a parallel State Court matter.  *Colorado River*

15   abstention applies.  They filed this case first in 2012, I

16   believe, in California.  The Court is allowed to provide

17   deference to that first-filed case.  We've cited *Northwest*

18   *Airlines* which does not limit the first-filed rule to

19   co-pending Federal cases, which is suggested by the

20   Plaintiffs.

21           Primary jurisdiction, which the teams' lawyers spoke

22   about, says the Court -- that compensation courts have

23   specialized knowledge and a specialized administrative body

24   like a comp court is a forum that this Court can defer to

25   under really the weight of case law authority.  And I suggest

1   that the *Lagler versus Zurich* case cited by us in our brief

2   can leave -- supports the idea of leaving the determination of

3   these types of issues for that specialized agency.  That goes

4   to the idea that they brought direct actions against insurance

5   companies.  Can't do that.  Neither Minnesota nor California

6   permits direct action lawsuits against insurance companies.

7           And then just a word about choice of law.  We

8   haven't undergone a choice of law analysis.  We have taken

9   what they have pled, which is California and Minnesota, we've

10  said in all of our arguments, I believe, Your Honor, that

11  under either law, Minnesota or California, our position is

12  that the case should be dismissed, these claims should be

13  dismissed.

14          And lastly, exclusive remedy applies.  There are no

15  Minnesota exceptions that apply.  That's the *Stringer* case and

16  co-employee liability is just really not part of this lawsuit.

17  The California exceptions do not apply.  *Unruh* has been

18  superceded by statute and abrogated.  And even their

19  California serious and willful petition includes fraudulent

20  concealment claims, and the serious and willful petition is

21  subsumed within the exclusive remedy rule.

22          They make a big deal out of the fact that we're not

23  a party to the serious and willful corollary action.  Well,

24  we've been a party in the work comp cases, the five of them, I

25  believe.  I don't think they've cited a case that says that we

1    have to be a Defendant in a corollary serious and willful

2    petition in order to invoke the exclusive remedy rule in this

3    case.  In fact, *Cervantes versus Great America Insurance*

4    *Company*, 140 California Appellate Third 763, 1983, says that

5    no case has come to our attention which holds that Section

6    4553 may not apply to insurers.

7            So, all in all, Your Honor, no personal

8    jurisdiction, no general personal jurisdiction, no specific

9    jurisdiction, no consent to jurisdiction, exclusive remedy.

10   We understand the Court's position on statute of limitations.

11   On battery, there's no allegation that we did anything in the

12   way of physical harm or contact.  On the bad faith claims,

13   there's no authority allowing third-party bad faith claims in

14   either California or Minnesota for the breach of an insurer's

15   duty of good faith.  Chubb's not even an insurer, they're a

16   holding company.

17           And with that, I thank the Court.

18           THE COURT:  Thank you.

19           All right.  Mr. Stuckey.

20           MR. STUCKEY:  Briefly, Your Honor.

21           THE COURT:  Yes.

22           MR. STUCKEY:  I have been involved in a lot of

23   workers' compensation cases, and every pleading that I ever

24   come across that involves Chubb Insurance has Chubb Insurance

25   in there.  Every pleading involving Mr. Peluso has Chubb

1  Insurance Company.  Now, we didn't just get those names from

2  the Complaint out of nowhere.  We took them from the names

3  that have been provided from the Defendants in the workers'

4  compensation case, the Chubb Insurance Defendants and also the

5  Federal Insurance Defendants.  And we reached out to Counsel

6  in a meet and confer to ask him if you have different names,

7  please give those to us because we want to make sure we

8  include the right names.  Never got a response.

9  Now, one thing I think is important to note is that

10  Chubb Insurance Company and Federal have been involved in the

11  workers' compensation process the entire time.  Counsel said

12  that they never received the Ruderman report.  That's news to

13  me.  I cannot tell you how I know because it's not embraced

14  within the documents that we filed so far.  However, I just --

15  I never thought that that response would come up.

16  There are two documents that I named that had never

17  before been produced and then were produced in May of last

18  year.  The first document was the December 18th, 1993,

19  document showing that Mr. Peluso had a concussion that

20  directly led to him being hospitalized, and that was a

21  concussion that led to the seizure.  That document was never

22  produced to us.

23  THE COURT:  Let me just ask a question.

24  Mr. Schmidt, were those documents produced by the

25  Clubs or by Chubb in the MDL?

1           MR. SCHMIDT:  Yes, Your Honor.  The medical records

2   of the Clubs were produced by the Clubs.  The Ruderman report

3   has been produced by the Clubs in April of 2015 as part of the

4   very first production.  It was produced in 1999 in response to

5   a third-party subpoena in connection with the 2000 disability

6   release that was signed.  The Clubs turned over the Ruderman

7   report and all the medical records to Chubb as part of the

8   worker comp proceedings multiple times since 2012.  I think

9   all Chubb's counsel must have meant is the initial report

10  didn't have Chubb as a cc, but the report has been produced *ad*

11  *nauseum* by the Clubs, timely at each possible instance.  All

12  of this, all of these issues go to the spoliation or sanction

13  claims in the worker comp case --

14          THE COURT:  No, I hear your argument.  But in the

15  MDL --

16          MR. SCHMIDT:  Yes.

17          THE COURT:  -- there were different productions by

18  the Clubs --

19          MR. SCHMIDT:  Yes.

20          THE COURT:  -- and by Chubb.  These two reports,

21  which production were they in, or maybe both?

22          MR. SCHMIDT:  I can't speak for what Chubb did.  I

23  can tell you the New Jersey Devils produced this Ruderman

24  report with the very first production, even before we had our

25  briefing on the motion to quash.

1          THE COURT:  Okay.  Yeah.

2          MR. SCHMIDT:  We agreed to produce medical records

3   for the six named Plaintiffs immediately.  This was part of

4   that very first production with no objection.

5          THE COURT:  Okay.  All right.

6          So Mr. Stuckey, it looks like the production in the

7   MDL was made by the Clubs.

8          MR. SCHMIDT:  It was.

9          THE COURT:  Okay.

10          MR. STUCKEY:  The -- I think the important thing to

11   get from that is that Chubb Insurance had an obligation to

12   produce medical records for Mr. Peluso.  They had -- the

13   medical records were produced to them, they have a higher

14   obligation as a workers' compensation carrier, not just as a

15   regular insurance carrier.  A workers' compensation carrier

16   actually has to participate in the care and administering the

17   care for the applicant.  And so when they had those records,

18   they had an obligation to not only produce them but to give

19   him medical care at that point.  And if that was not done,

20   then that is a violation that was committed by them and it was

21   committed on a Plaintiff who lives here in Minnesota, and it's

22   an ongoing violation because he has continued to be injured

23   since that point.

24          Just to clarify because I just want you to get a

25   clear understanding of the cases that are ongoing so you don't

1    think there's just so much that's happening right now.  There

2    are three cases that Mr. Peluso is involved with.  It's the

3    workers' compensation case, which is purely for what was filed

4    in 2012 for his orthopedic and neurological injuries; that is

5    all that case was filed to address.  And, of course, you know

6    with workers' compensation, this is a no-fault system, so

7    there's nothing -- it doesn't give lost wages or pain and

8    suffering or anything like that.

9          The second case, which was filed in 2016, is a case

10   that is a serious and willful case and it is directed only to

11   the teams in that case, and it is a result of that team's

12   obligations, their violations of California OSHA laws, of

13   fraudulent concealment, and a few other things.  But they in

14   no way overlap or relate to the scope of the claims involved

15   in this case.

16          THE COURT:  But Mr. Peluso is also a member of the

17   putative class in the MDL, is he not?

18          MR. STUCKEY:  He is.  He is.  Although --

19          THE COURT:  Although that's against the NHL.  I

20   understand that.

21          MR. STUCKEY:  Correct.  And he also won't be

22   involved in that case very much longer, which actually takes

23   me to my final point, and --

24          THE COURT:  What do you mean he won't be involved in

25   that case very much longer?

1          MR. STUCKEY:  Because he's going to be removing

2     himself from the NHL case.

3          THE COURT:  Okay.

4          MR. STUCKEY:  The -- I understand that the factor of

5     the interest of the forum in providing -- the interest of the

6     state in providing a forum to its citizens does not -- is not

7     as powerful as some of the other factors.  However, I think

8     there has to be some consideration for that in this situation.

9     One of the reasons that his case was filed for the California

10    workers' compensation case in California was because

11    California is the only state out there that allows for a

12    person to file a claim as a result of their injuries past a

13    one-year statute of limitations.  In California, it's one year

14    from the time that you're injured or from when you find out

15    about your right to file a claim.  And so that's the reason he

16    was able to file a claim in California.  Had he had the

17    opportunity to file a claim in Minnesota, I'm sure he would

18    have chosen Minnesota.

19          We are in the situation now where -- and this is

20    embraced within the papers -- that Mr. Peluso just went

21    through a competency evaluation because he cannot fly out to

22    California.  He can't get on a plane.  His neurological

23    condition is really bad, and for other reasons, it makes it

24    impossible for him to travel elsewhere.  If -- if the venue

25    were to change or if we had to file a case elsewhere, there

1   would be no relief for Mr. Peluso.  His California case is at

2   a standstill right now and we are trying to do everything we

3   can to actually get it moving but -- to get help from the

4   judges, but it's just not going to happen because he's never

5   going to be able to come out to California to finish his case

6   which means that --

7           THE COURT:  But why does he have to physically be

8   there?  In this day and age, why couldn't there be an

9   accommodation for him through video testimony or something?

10          MR. STUCKEY:  I think Mr. Peluso would love an

11  answer to that question.  I agree with you.  However, it is

12  the Judge who makes the determination, and the Judge has

13  decided that because of the -- because of the documents that

14  were produced in the case, because of these very serious

15  medical records that changed his doctors' apportionment and

16  impairment -- they just changed the entire medical record --

17  that Judge has made a determination that he must come back out

18  to California to be entirely reevaluated again in order to

19  proceed with his case, including 20 evaluations and then

20  finally another trial.

21          And the Appeals Court has -- is doing everything

22  they can do to try to prevent that from happening, but if it

23  ever ends up happening, it's going to be a long time.  So,

24  again, *Marshall versus Inn of Madeline Island*, it talks about

25  the interest in providing a forum for its citizens and in this

1  situation, Your Honor, I think that it is an interest that

2  should probably weigh heavily in your consideration.

3          THE COURT:  Thank you so much, Mr. Stuckey.

4          Yes, briefly, please, Mr. Pham.

5          MR. PHAM:  Just very briefly, Your Honor.

6          The Plaintiff only needs to show a minimal *prima*

7  *facia* showing of personal jurisdiction, and like it was

8  pointed out before, all evidence should be construed most

9  favorable for the Plaintiff.  Something that was just

10 enlightening is even Your Honor had asked Chubb which entities

11 were what, how many are there.  I believe Counsel even said

12 there are hundreds or if not thousands of separate

13 subsidiaries operating within the -- this Chubb umbrella.

14         And it's somewhat disingenuous to only submit one

15 Declaration for one entity that does not have any offices here

16 where very clearly Chubb does have offices, some entities of

17 Chubb has offices here.  There are some entities that are

18 responsible in the state for the administration of medical

19 care and would be responsible for the administration of

20 medical care for Mr. Peluso.  At the very least, we should

21 have an opportunity to explore and understand the

22 relationships between each individual subsidiary because at

23 this point in time, all we can go on is that they are

24 conspired together and worked together to withhold these

25 documents.  Ultimately if one -- one entity was responsible

1    for concealing the documents, then that could change.  But at

2    this point in time, I believe we should have an opportunity to

3    further discuss it.

4           With -- and with a minimal showing, you know -- we

5    provided evidence that they had multiple offices; at least

6    three of these subsidiaries are registered and can accept

7    service of process in this state, which essentially means they

8    consent.  The subsidiary can also convey personal jurisdiction

9    over a parent company under the *Anderson* case when that parent

10   company controls or benefits from the subsidiary's work.  So,

11   at this minimal level, at this early onset of the proceedings,

12   you know, I think the -- we've met our burden to show personal

13   jurisdiction over Chubb.

14          I know I already briefly addressed it beforehand, so

15   I won't take up much of your time again regarding abstention,

16   Your Honor.  Defense counsel brings up the fact that *Unruh* has

17   been superceded by statute.  It was superceded on other

18   grounds; it was superceded to address specifically their

19   analysis of a dual capacity doctrine and not whether the

20   extreme and outrageous conduct of an insured removes the

21   protection of exclusivity from the Workers' Compensation

22   Board.

23          In fact, the case that we cite, *Gomes versus*

24   *Michaels Stores*, addresses that directly, even though that

25   they have -- even though that the case has been superceded,

1    the holding of that case, that outrageous conduct by the

2    insurance carrier and in this case, continuing suppression and

3    withholding of critical medical information that if provided

4    to any doctor at any point in time, even if they still

5    withheld medical care, could have saved Mr. Peluso

6    significant -- saved Mr. Peluso from significant injury.

7    Because of that outrageous conduct, again, there's a separate

8    claim that was created that it falls outside of workers'

9    compensation and in which case it should not be -- in which

10   case the resolution of the workers' comp case would not

11   resolve any of the claims brought by Mr. Peluso.  That's it.

12             THE COURT:  Thank you.

13             Brief response, Mr. Schmidt.

14             MR. SCHMIDT:  Unless the Court has any questions,

15   nothing further.

16             THE COURT:  Well, I have to say I have some concern

17   about whether Mr. Peluso has any forum if his inability to

18   travel to California will preclude him the ability to follow

19   through on his work comp claim.

20             MR. SCHMIDT:  So, good question.  I think that last

21   piece highlights why this entire dispute belongs before the

22   worker comp tribunal.  There was an IME conducted of

23   Mr. Peluso recently by a neuropsychologist who came here at

24   the Court's instruction and Mr. Peluso said he could travel,

25   he was fine to travel, eager to travel.  Mr. Stuckey then

1    appealed that to the worker comp board, which is like an

2    intermediate appellate board, actually did that *ex parte*

3    without anyone getting notice, and the worker comp board said,

4    let's have a neurologist look at him again.

5           So there's going to be an opportunity to see whether

6    Peluso is going to travel to Minnesota -- I mean to

7    California, rather, or whether he can -- those exams can take

8    place here.  That's for the worker comp tribunal to deal with.

9    You are right.  Many courts are able to accommodate

10   individuals based on their medical needs.  It's actually a

11   real open question in light of Mr. Peluso's statements to the

12   neuropsychologist just six weeks ago that not only can he

13   travel, but he's eager to travel back to California.  So,

14   those are the type of questions, Your Honor, that highlight

15   that the jurisdictional facts that you're considering are

16   relevant for jurisdiction.

17          The Ruderman report and this statement that Peluso

18   was -- could play hockey and he understood the risks, it's

19   relevant for the spoliation claim, as well, which the case law

20   teaches can only be brought before the worker comp tribunal

21   and further highlights why the worker comp regimes are the

22   exclusive remedies.  Here, the record is clear, not only did

23   the Devils send Peluso to two neurologists within five days of

24   the grand mal seizure, let him have this personal visit with

25   the doctor where they discussed the risk, then was seen by the

```
 1   team doctor, but then turned the report over ad nauseum.
 2   Those issues, though, will be decided as part of that
 3   spoliation S&W claim in the worker comp proceeding, and that's
 4   the only forum under Minnesota law or California law or any
 5   relevant jurisdiction where those claims can be brought.
 6            And if the appeals board in California determines --
 7   or looks at the results of this new neurology IME and says,
 8   hey, let's do some of the exams in Minnesota, then that court,
 9   the parties in that proceeding, will figure out the best way
10   to appropriately accommodate the interest of Mr. Peluso and
11   the parties.
12            THE COURT:  All right.  Very good.
13            MR. SCHMIDT:  Thank you.
14            THE COURT:  Anybody else have any comments?
15            Sure.  Mr. O'Meara.
16            MR. O'MEARA:  Thank you, Your Honor, just briefly.
17            With due respect to the position of the Plaintiffs,
18   we are not trying to be disingenuous with anything.  We went
19   out and asked for an Affidavit from a high-level officer about
20   Defendants that had been sued so Mr. --
21            THE COURT:  I understand that.  I think it's
22   frustrating because in the -- for years in the MDL, this is
23   the first time I learned that Chubb was not the insurer.  I
24   have always assumed Chubb was the insurer.  Chubb appeared,
25   the lawyers appeared on behalf of Chubb, all the productions
```

1    were made by Chubb.  Apparently that was just careless use of

2    the entities involved or something.  I mean, I don't

3    understand why that happened, but one would easily believe

4    that Chubb was the insuring entity.

5            MR. O'MEARA:  And I understand.  And, you know, I'm

6    not counsel in the MDL litigation.  I have no idea what's

7    transpired in that case.  All I can tell you is, Your Honors,

8    that we worked very hard over many hours trying to get this

9    right and trying to tell the Court what information we had

10   with respect to the two Defendants that have been sued:  Chubb

11   Holdings, Chubb Group Holdings, Inc., and Federal Insurance

12   Company.  And we tried to articulate to the Court as best we

13   can through the Affidavit of the Technical Officer and VP what

14   that was all about, and they're not an insurance company in

15   relation to Chubb Holdings.

16           And the reason I talked about the report was that

17   that's the main document in the case for which they claim

18   Defendants as a whole.  All of us, did not take any measures

19   to protect Mr. Peluso and hid documents for 22 years.  Well,

20   we didn't get the Ruderman report.  We weren't cc'd on it.

21           THE COURT:  Well, some Chubb entity did.  I just

22   don't think it was you.

23           MR. O'MEARA:  Somebody ultimately did years later,

24   and today we're hearing it being disclosed as part of a

25   workers' compensation claim in California and, you know, the

1    2012, 2013, or later timeframe, maybe 2015.  So, that's not 22

2    years ago, is my point.  And so I think the Court understands

3    our position.  I wasn't trying to say that some Chubb entity

4    didn't get the report at some point between the time

5    Mr. Peluso was seen by Dr. Ruderman and now; I'm just trying

6    to show you that with the record in front of you as described

7    by the Plaintiff, we were not copied on that report initially.

8            And when they say that in the course of

9    administering a claim we had an obligation to tell them

10   something and when Chubb Group Holdings is not an insurance

11   company, never issued a policy to anyone, none of these teams,

12   there is no obligation for Chubb Group Holdings to disclose at

13   all.  And so certainly in relation to Chubb Group Holdings,

14   the party that they've sued, none of those arguments apply.

15   And this 22-year disclosure suggestion is a legal conclusion

16   drawn from the facts that they pled which this Court does not

17   have to consider.

18           Thank you.

19           THE COURT:  Thank you, Mr. O'Meara.

20           Yes, Mr. Stuckey, briefly.

21           MR. STUCKEY:  Just very briefly.

22           THE COURT:  Sure.

23           MR. STUCKEY:  On behalf of my client, I really just

24   want to clear the record that the evaluation that he was given

25   here in Minnesota, it was an evaluation by a psychologist who

1   was making a competency determination to determine whether

2   Mr. Peluso was competent to go through with his trial.  It was

3   not a competency determination to determine whether he could

4   fly to California.  In fact, when the appeals board overturned

5   the Judge's decision, removed her decision entirely, the

6   reason they did it is because they said this is a psychologist

7   who's making a determination without having reviewed any

8   medical records.  They said -- they pointed to his treating

9   doctor who said that he -- he actually said that he thought

10  that the risks of the continued litigation in and of itself

11  was too much for Mike and it would present too much of a

12  seizure disorder -- or too much of a chance of having another

13  seizure, and so he recommended that he not.

14          And they also pointed to the QMEs and the

15  neurologist who already evaluated him, applicants and defense,

16  who said that he cannot fly commercially and that traveling

17  would be too much for him, so I wanted to correct the record

18  on that.

19          THE COURT:  Okay.  Thanks.

20          Very good.  The Court will study this carefully.

21  It's taken under advisement.

22          Court is adjourned.

23          **(WHEREUPON, the matter was adjourned.)**

24              (Concluded at 10:42 a.m.)

25

Heather A. Schuetz, RMR, CRR, CRC, RSA
(651) 848-1223

1

2                        *        *        *        *

3

4                              CERTIFICATE

5

6          I, Heather A. Schuetz, certify that the foregoing is

7    a correct transcript from the record of the proceedings in the

8    above-entitled matter.

9

10         Certified by: s/ Heather A. Schuetz_____
                          Heather A. Schuetz, RMR, CRR, CRC, RSA
11                        Official Court Reporter

12

13

14

15                         I N D E X                    Page:

16   Argument by Mr. Schmidt............................... 4

17   Argument by Mr. Stuckey.............................. 16

18   Argument by Mr. Pham................................. 29

19   Argument by Mr. O'Meara.............................. 34

20   Response by Mr. Stuckey.............................. 48

21   Response by Mr. Pham................................. 55

22   Reply by Mr. Schmidt................................. 57

23   Reply by Mr. O'Meara................................. 69

24   Surreply by Mr. Stuckey.............................. 61

25